**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09 CR 1032 |
| | ) | |
| ISSAIAH HAYES, | ) | Judge Joan H. Lefkow |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Issaiah Hayes has moved *pro se* for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). (Dkt. 340.) The motion is granted. Hayes's custodial sentence is reduced to time served, and he is ordered to be released from the custody of FCI Oakdale I as soon as practicable and consistent with the judgment of medical personnel. Defendant's term of supervised release will commence immediately upon his release and the conditions of supervised release are modified with the condition that the first six months of his sentence shall be served in home confinement with the method of assuring compliance to be determined by the Probation Department within 72 hours of his release.

**BACKGROUND**

In 2012, a jury found Hayes guilty of conspiracy to distribute heroin at a trial where Hayes both represented himself and refused to participate. (Dkt. 251); *United States* v. *Hayes-Bey*, 569 F. App'x 456, 457 (7th Cir. 2014) (mem op.). In 2013, this court sentenced him to 252 months in prison, 12 months more than the mandatory minimum sentence, based in part on Hayes's obstruction of justice by attempting to interfere with a witness's testimony before trial. (Dkt. 251.)

Hayes is now an inmate at FCI Oakdale I in Louisiana, which has had an outbreak of COVID-19. "By now [certain] details of the global COVID-19 pandemic are well-known to the parties and the general public," including that it spreads rapidly through respiratory droplets, can be spread by asymptomatic individuals, and can cause severe illness and death. *Ruderman* v. *Kolitwenzew*, No. 20 C 2082, 2020 WL 2449758, at *1–2 (C.D. Ill. May 12, 2020). The Centers for Disease Control and Prevention confirm that COVID-19 has infected over 2.8 million Americans and killed over 129,000 since the first case was reported in this country about five months ago.[1] In a country of nearly 330 million,[2] that figures as a confirmed infection rate of approximately 0.85% and a fatality rate of 0.039%.

Because there is no known vaccine or cure for COVID-19, the CDC recommends, among other things, "social distancing," or maintaining a distance of at least 6 feet from other people and avoiding crowded places and enclosed gatherings, to minimize the risk of transmission. *Ruderman*, 2020 WL 2449758, at *2. Social distancing is especially difficult in jails and prisons. Thus, despite Oakdale's prevention efforts, the government reports that as of May 22, 2020, 185 Oakdale inmates have contracted COVID-19, including 91 active cases, 78 recoveries, and 7 deaths; 18 Oakdale staff members have also contracted COVID-19, including 10 recoveries. (Dkt. 343 at 5.) In an inmate population that fluctuates around 1,000,[3] FCI Oakdale I has a

---

[1] CDC, *Coronavirus Disease 2019 Cases in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last accessed July 6, 2020).

[2] United States Census Bureau, *U.S. and World Population Clock*, https://www.census.gov/popclock (last accessed July 6, 2020).

[3] Prisoners come and go, and in light of the outbreak, the Bureau of Prisons has moved many inmates out of Oakdale. The court considers 1,000 inmates a fair denominator to illustrate how much worse Oakdale is than the rest of the country at containing the coronavirus. *Compare* Bureau of Prisons, *FCI Oakdale I*, https://web.archive.org/web/20200402234601/https://www.bop.gov/locations/institutions/oak/ (internet archive as of April 2, 2020) (971 inmates), *with* Bureau of Prisons, *FCI Oakdale I*, https://www.bop.gov/locations/institutions/oak/ (last accessed July 6, 2020) (901 inmates).

confirmed infection rate of 18.5%—about 22 times worse than the United States overall—and a fatality rate of 0.7%—about twice as bad. As of the date of this filing, the BOP's website reports that 207 inmates at Oakdale were infected but recovered, with 1 remaining active case and 7 deaths.[4] While it is comforting to see that many inmates are recovering from COVID-19 infections, the increase in total infections means that Oakdale's infection rate has worsened since the government's last report and demonstrates that infections have continued despite Oakdale's mitigation efforts. Fortunately, Hayes tested negative for COVID-19 in a "surveillance" test on May 14, 2020. (Dkt. 344-2 at 36.)

On April 30, 2020, Hayes filed a request for compassionate release with the warden of Oakdale. (Dkt. 344-1 at 1.) Hayes explained that he has diabetes mellitus, hypertension, and obesity, all of which significantly increase his risk of severe illness if he contracts COVID-19. (*Id.*) Oakdale's warden denied his request on June 1, 2020. (Dkt. 349.) The warden denied Hayes's request for three reasons: (1) Hayes failed to submit a plan for where he would receive medical treatment or how he would pay for it if he were released; (2) Hayes did not have a terminal or debilitating illness; and (3) Hayes is "considered a healthy male with no medical condition that is high risk to COVID-19."[5] (*Id.* at 1-2.)

Prior to filing his request for compassionate release at Oakdale, Hayes had mailed the present *pro se* motion to the court on April 27, 2020. (Dkt. 340 at 1.) The government filed an initial response on May 22, 2020. (Dkt. 343.) The government filed a supplemental response

---

[4] Bureau of Prisons, *COVID-19 Coronavirus*, https://www.bop.gov/coronavirus (last accessed July 6, 2020)

[5] The warden applied BOP Program Statement 5050.50, *Compassionate Release/ Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(c)*, a policy last updated in January 2019, before the COVID-19 pandemic. (Dkt. 349 at 1).

after the warden issued his denial. (Dkt. 347.) The court appointed counsel to supplement Hayes's petition to provide proof of his housing plans if released, which counsel filed on July 1, 2020. (Dkt. 360.)

## LEGAL STANDARD

Under 18 U.S.C. § 3582(c), "the court may not modify a term of imprisonment once it has been imposed except" in narrow circumstances. One of those circumstances, commonly called "compassionate release," provides:

> in any case . . . the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--
>
> (i) extraordinary and compelling reasons warrant such a reduction;
>
> . . .
>
> And that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission

18 U.S.C. § 3582(c)(1)(A)(i). The relevant Sentencing Commission Guideline imposes the additional requirement that the defendant not be "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(a)(2)

## ANALYSIS

As set forth above, Hayes has exhausted his administrative remedies with the Bureau of Prisons and Section 3582 thus authorizes the court to consider his request. 18 U.S.C. § 3582(c)(1)(A). The BOP's determinations on a request for compassionate release are not binding upon or entitled to deference from the court. *United States v. Beck*, 425 F. Supp. 3d 573,

4

587 (M.D.N.C. 2019) ("[T]he First Step Act give[s] courts independent authority to grant motions for compassionate release and says nothing about deference to BOP, thus establishing that Congress wants courts to take a *de novo* look at compassionate release motions."). The warden's determination that Hayes has "no medical condition that is high risk to COVID-19," (dkt. 349 at 2), is patently wrong. Hayes has been diagnosed with diabetes, hypertension, and obesity, all of which increase his risk of severe illness if he contracts COVID-19.[6] Indeed, one study of 5,700 COVID-19 patients in New York City reports that those three conditions are "the most common comorbidities." *United States* v. *Williams*, No. 19-CR-134, 2020 WL 3073320, at *4 (D. Md. June 10, 2020) (citing Safiya Richardson et al., *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized with COVID-19 in the New York City Area*, JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION (Apr. 22, 2020))); *see also United States* v. *Lewellen*, No. 09 CR 332, 2020 WL 2615762, at *1 (N.D. Ill. May 22, 2020) ("[Obesity and hypertension] . . number among the most common comorbidities (that is, other conditions of ill health) of COVID-19 patients who require hospitalization"). The government agrees that Hayes's COVID-19 comorbidities satisfy the requirement that he establish "extraordinary and compelling reasons" warranting his release. (Dkt. 343 at 23–24.)

Although Hayes fortunately tested negative for COVID-19 on May 14, 2020, the disease remains highly transmissible in tight spaces like Oakdale. And, despite the BOP's efforts, Oakdale is more than twenty times worse at containing COVID-19 than the rest of nation, and its inmates are twice as likely to die of COVID-19 than members of the population at large. Hayes remains at extraordinary risk.

---

[6] *See also* CDC, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last accessed July 6, 2020) (listing type II diabetes, pulmonary hypertension, and severe obesity as risk factors for people who contract COVID-19).

Thus, the only contested issue is whether Hayes poses "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(a)(2). Section 3142(g) provides that the court should consider:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including--
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. . . .

The government argues that Hayes's criminal history, the nature of his offense, and his former status as a "sovereign citizen" suggest that he remains a danger. (Dkt. 343 at 25-26.) Hayes has a serious criminal history. In 1994, when Hayes was 22, he was arrested for firing a gun from a distance in the direction of an occupied police squad car. (Dkt. 234 ¶ 45.) He was convicted of aggravated discharge of a firearm, for which he was sentenced to 15 years' imprisonment in the Illinois Department of Corrections, though he was acquitted of attempted murder. (*Id.*). But, despite the seriousness of the offense, the IDOC determined that Hayes was worthy of supervised release in 2002, just over halfway into his sentence. Hayes maintained essentially a clean record until committing this nonviolent drug distribution offense—in between,

he was convicted of operating an uninsured motor vehicle (*id.* ¶ 47) and arrested on charges of which he was either acquitted or which were dismissed (*id.* ¶¶ 66–67).

Hayes was convicted in this case for running an open-air heroin market in Chicago and thereby conspiring to distribute controlled substances. Though controlled substances pose a danger to communities in which they are distributed, Hayes did not use violence to distribute them. Hayes did, however, attempt to evade arrest by moving to Indiana, using aliases, and fleeing on foot from the police. While these actions reflect a lack of respect for the law, they do not reflect continuing dangerousness.

The government also highlights Hayes's conduct at trial, during which Hayes insisted that he was not subject to the court's jurisdiction because of his Moorish sovereignty. Hayes represented himself but refused to participate, requiring him to observe the proceedings by video link from another courtroom. *Hayes-Bey*, 569 F. App'x at 457. Moreover, during his trial, Hayes attempted to interfere with the testimony of a witness. Although the government describes this as intimidation, the interference was that Hayes shouted to the witness, "I have never done anything to you. I'm facing twenty years to life. You better think about what you say before you say it in court." (Dkt. 247 at 7–8.) As the court found at sentencing, this was "obstruction of justice," (dkt. 283 at 19:3), but in the court's judgment, that outburst in 2012 does not reflect that Hayes is a "a danger to the safety of" that witness in 2020. In any event, Hayes now expresses remorse for his conduct at trial. (Dkt. 360-3.)

In short, when Hayes was 22, he committed a violent offense that fortunately does not appear to have injured anyone. Hayes is now 47, and the record shows that he no longer poses a danger to individual or community safety. Since being detained at Oakdale, Hayes earned his GED, completed a drug education program, and has enrolled in several self-bettering courses

7

such as creative writing, a health care seminar, and a financial responsibility course. (Dkt. 344-1 at 4.) Although the precise good-conduct credit calculations are not in the record, Hayes's projected release date of October 2028 (dkt. 343 at 26) suggests that he has earned significant good-conduct credit on a sentence that could otherwise run until 2031. Likely because of Hayes's work toward reform, the Bureau of Prisons designated him as "low risk recidivism level" as of December 2019. (Dkt. 344-1 at 4.)

A grant of relief from Hayes's custodial sentence does not mean that he will be reintroduced to society without restriction. As another judge of this court recently stated, "requiring Defendant to serve out the remainder of his sentence on home incarceration will severely limit his opportunity to commit any criminal acts." Dkt. 442, *United States* v. *Guzman*, No. 13 CR 576 (N.D. Ill. May 28, 2020). In a counseled supplement, Hayes has satisfied the court that home confinement with the mother of his child is feasible, and that on home confinement, he will have adequate medical care and a chance to gain employment. (Dkts. 360-1, 360-4.) Dozens of family members, friends, and community members submitted affidavits (or emails to Hayes's appointed counsel) attesting that they will support Hayes during home confinement and as he reintegrates into society. (Dkts. 360-4–25.) Although the court does not order that Hayes "serve out the remainder of his sentence on home incarceration," a six-month home incarceration period will limit his ability to reoffend.

Finally, the court's assessment of the section 3553(a) factors largely overlaps with its assessment of Hayes's risk of being a danger to the community, and his commendable conduct in prison. Furthermore, the court notes that he has served over nine years in prison, which is "a long time by any measure," *Lewellen*, 2020 WL 2615762, at *7, and adequately reflects the seriousness of his offense and deters him and others from committing similar offenses in the

8

future. Moreover, Hayes will serve the remainder of his term—until October 14, 2028—on supervised release.

## **CONCLUSION AND ORDER**

Defendant meets the criteria that (1) he has an extraordinary and compelling circumstance under governing law and (2) he is not a danger to the community should he be released from custody. Therefore, the Bureau of Prisons is ordered to release Hayes from its custody as soon as practicable according to medical protocols of the Bureau. Hayes's custodial sentence is hereby reduced to time served, and he is placed on supervised release to commence immediately upon his release for the duration of his sentence, until October 14, 2028, with the condition that the first six months of his sentence shall be served in home confinement.

Date: July 7, 2020

_____
U.S. District Judge Joan H. Lefkow